# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

PAUL MILLNER,                  Case No. 1:08-cv-841

    Plaintiff,                 Judge Herman J. Weber
                            Magistrate Judge Timothy S. Black

vs.

SYSCO FOOD SERVICES OF
CINCINNATI, LLC,

    Defendant.

## REPORT AND RECOMMENDATION[1] THAT:
## (1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 38)
## BE GRANTED; AND (2) THIS CASE BE CLOSED

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 38) and the parties' responsive memoranda (Docs. 39, 43).

## I.     BACKGROUND

Defendant SYSCO Cincinnati, LLC ("SYSCO Cincinnati") terminated Plaintiff Paul Millner from his job as a Procurement Specialist allegedly due to Plaintiff's poor job performance. Plaintiff, an employee of SYSCO Cincinnati for nearly 30 years, claims that he was terminated as a result of age discrimination.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

## II.   UNDISPUTED FACTS[2]

1. Plaintiff started working for Sysco in 1979 as a "Buyer." (Doc. 24 at 7, 14, 16, 21).

2. The title "Buyer" became "Merchandiser" and later "Procurement Specialist." (*Id*. at 18-19, 24).

3. Sysco evaluated its Procurement Specialists on the basis of achievement of goals in several categories: service level, days of inventory, and aged inventory. (Doc. 24 at 32-41). The performance criteria of service level, days of inventory, and aged inventory are all objective measures. (*Id.* at 74-75). A "good" Procurement Specialist keeps service levels high, days of inventory low, and aged inventory low. (*Id.* at 71-72). "Service level" measures the percentage of success in meeting customer orders with stock on hand; "days of inventory" measures the amount of inventory in stock to meet customer demand; and "aged inventory" measures inventory that is in stock for a certain amount of time without being sold. (*Id.*)

4. During his career, Plaintiff earned "satisfactory" to "excellent" performance reviews. (Doc. 31 at 47; Doc. 24 at 83). In both 2001 and 2003, Plaintiff earned "exceeds standards" on his evaluations. (Doc. 39, Exs., A and B).

5. Despite these ratings, Plaintiff had problems with being unorganized at work. (*Id.* at 152). The Company President sent a memo to Plaintiff in 1990 warning him that his disorganization was precluding him from being successful in his job. (*Id.* at 148-149, 154). Other members of management brought the same issue to Plaintiff's attention throughout the years. (*Id.* at 155).

6. In his last three years (36 months) of employment, Plaintiff was merchandiser of the month one time. (*Id.* at 65).

7. Plaintiff's October 2005 performance appraisal indicated that he needed to improve in the areas of days of inventory, service level, and aged inventory. (*Id.* at 161). These were the same areas of criticism later presented to him in his disciplinary counselings in January, February and March 2008. (*Id.*

---

[2] These are the parties' common undisputed facts taken from both Plaintiff's and Defendant's proposed findings of fact and conclusions of law. (*See* Docs. 41, 44).

at 161-162). Plaintiff believed the 2005 evaluation was accurate, and he recognized that there were problems with his performance that needed to be corrected. (*Id.* at 162-163).

8. Plaintiff was disciplined in September 2006 for poor performance with respect to service level. (*Id.* at 167-168). At that time, Plaintiff was told that failure to improve his performance would result in further disciplinary action, up to and including termination. (*Id.* at 168-169).

9. On September 8, 2006, Plaintiff wrote in his daily calendar that he was on notice that his job was in jeopardy due to poor performance. (*Id.* at 247).

10. Plaintiff's November 16, 2006 performance appraisal indicated that improvement was required in job knowledge, quality of work, initiative, planning & organizing, judgment, and communication. (*Id.* at 178-180). Plaintiff agrees that it was a bad performance appraisal. (*Id.* at 180-181). Plaintiff needed improvement in all three of the objectively measured criteria: including service level, aged inventory and days of inventory. (*Id.* at 181-183). These were the same issues on which he was later counseled in January, February, March and April of 2008. (*Id.* at 182).

11. In December 2006, the Vice President of Merchandising met with Plaintiff and warned him that he should be concerned about his future with the Company and that he might be subject to termination because his performance numbers did not reflect that he cared enough about the Company. (*Id.* at 90-91, 169). Plaintiff was not surprised about the warning, because he knew that his service levels had been poor. (*Id.* at 91-92, 169-170).

12. Plaintiff did not meet his days of inventory goal in the first, second, third, or fourth quarters of fiscal year 2007. (*Id.* at 175, 185, 188-89, 191). Also, Plaintiff's service levels were still "poor." (*Id.* at 170).

13. Plaintiff's February/March 2007 performance appraisal indicated that his days of inventory levels continued to be a major problem and his aged inventory continued to be a problem. (*Id.* at 195). He was warned that days of inventory had reached crisis proportions. (*Id.* at 195-196). Also, Plaintiff acknowledged that his service levels had been an issue for some years with the Company. (*Id.* at 92). His overall evaluation was "improvement required." (*Id.*) His manager warned him that the Company would continue to monitor his overall unsatisfactory performance. (*Id.* at

196).

14. In mid-2007, Sysco awarded Plaintiff a "Lifetime Achievement Award" for "outstanding performance and dedicated service." (Doc. 24 at 65, 87-88; Doc. 29 at 41; Doc. 26 at 23).

15. Plaintiff's October 2007 performance appraisal reflected that he continued to have the same problem with days of inventory and aged inventory as he had had in previous evaluations. (*Id.* at 204-05). Plaintiff acknowledged this continuing problem. (*Id.*)

16. In January 2008, Plaintiff knew and understood that he had to improve his performance in all three of the goals of service level, days of inventory, and aged inventory, or else his job was in jeopardy. (*Id.* at 89). When Plaintiff was counseled in January 2008, he was not meeting his goals in any of the three objective criteria. (*Id.* at 212). In particular, his aged inventory number was almost twice what it was supposed to be. (*Id.*) Plaintiff was warned that if he did not improve his performance and meet his goals, further disciplinary action could be taken, up to and including dismissal. (*Id.* at 213).

17. Plaintiff received a series of Employee Counseling Reports regarding his performance. (Doc. 24 at 88-89, 93, 211, 214-17). He received these reports on January 11, February 12, and March 17, 2008. (*Id.*)

18. Plaintiff disagreed with Sysco's assertion that the goals presented to him were "tough but fair." (*Id.* at 227-28; Ex. 36). In fact, Plaintiff protested to Mr. Fleming that Sysco's goals were unrealistic. (*Id.* at 117, 119, 120, 123).

19. Management was available to help him with any issues relating to service level, days of inventory, or aged inventory. (*Id.* at 78).

20. Plaintiff was counseled again in February 2008. (*Id.* at 216). Plaintiff still was not meeting the required goal for aged inventory, and his days of inventory had gotten even worse than the previous month. (*Id.* at 217-18).

21. When Plaintiff was counseled again in March 2008, he still was not meeting his goals for days of inventory and aged inventory. (*Id.* at 223). His days of inventory was still not at an acceptable level, and his aged inventory was even worse than the previous month. (*Id.*) It was Plaintiff's responsibility

to be proactive and do something about inventory before it became aged. (*Id.* at 130). He was again warned that if he did not meet his goals, further disciplinary action could be taken up to and including dismissal. (*Id.* at 224-25). Plaintiff knew his job was in jeopardy. (*Id.* at 225). Plaintiff knew that he needed to achieve all three goals to satisfy the PIP. (*Id.* at 228).

22. In April 2008, Plaintiff failed to meet the goals in any of the three objective criteria. (*Id.* at 228-29). Plaintiff's service level was worse in April 2008 than it was in January 2008 when the counseling began. (*Id.* at 118). His aged inventory had skyrocketed to the highest level it had been throughout the counseling period. (*Id*. at 229-230). Management had expended significant effort to raise his awareness of performance issues. (*Id.* at 230).

23. On April 22, 2008, Rex Brough, Vice President of Administration (HR), and Jeff Nicholas, Vice President of Merchandising, met with Plaintiff and reviewed with him his performance since the counseling began in January 2008. (*Id.* at 95). Because Plaintiff had failed to meet the objective performance criteria of his job, Mr. Brough and Mr. Nicholas gave him three options. The first option was immediate termination. (*Id*.) The second was that Plaintiff would be given the opportunity to work through the end of June 2008, during which time his job responsibilities would be curtailed and he would be able to look for a job with the assistance of a job placement service. (*Id*.) The third option was that he could take another 30 days to try to improve his performance and, if he was not able to do that, he would then be terminated. (*Id*.) Plaintiff told Mr. Brough and Mr. Nicholas that he was going to take the additional 30 days to attempt to improve his performance. (*Id.* at 95-96).

24. Plaintiff understood that if his performance did not get better in 30 days, he was going to be terminated at the end of the 30 days. (*Id.* at 108-109).

25. On April 27, 2008, Plaintiff told his wife that his termination was imminent. (*Id.* at 238).

26. As of May 17, 2008, Plaintiff still was not meeting any of the three objective performance goals. (*Id.* at 240-241).

27. After further communication with Mr. Brough in May 2008, Plaintiff knew that if he did not sign a separation agreement relating to extending his employment through the end of June 2008, he would be terminated by June 4, 2008. (*Id.* at 112).

28. Sysco terminated Plaintiff on June 4, 2008. (*Id.* at 255).

### III.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

### IV.  ANALYSIS

#### A.  Age Discrimination

Plaintiff asserts age discrimination claims under both Ohio and federal law. The same evidentiary framework applies to discrimination claims brought under the ADEA

-6-

and discrimination claims brought under Ohio state law. *Allen v. Ethicon, Inc.*, 919 F. Supp. 1093, 1098 (S.D. Ohio 1996). Therefore, the claims will be considered together. Discrimination on the basis of age is contrary to both Ohio and federal law. U.S.C. § 621 *et seq.*, Ohio Rev. Code. § 4112.02(A). Under these provisions, a plaintiff may assert a *prima facie* case through the presentation of either direct or indirect evidence. *Allen*, 919 F. Supp. 1093, 1098 (S.D. Ohio 1996). In many cases, evidence of direct discrimination can be difficult to produce, so the law allows for a plaintiff to raise an inference of discrimination through circumstantial evidence. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). In the case at hand, Plaintiff does not proffer direct evidence of age discrimination. Therefore, the Court will focus upon circumstantial evidence in evaluating Plaintiff's *prima facie* case.

In order to prevail on a circumstantial evidence theory, a plaintiff must establish a *prima facie* case of age discrimination by proving that: (1) he was over 40 years of age; (2) he was qualified; (3) he suffered an adverse employment action; and (4) he was replaced by a younger person or treated differently than a similarly-situated younger employee. *McDonnell Douglas*, 411 U.S. 792, 802. The *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

After a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was terminated, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Texas Dep't. of Cmty. Affairs*, 450 U.S. at 254. A defendant need not persuade the court that the defendant was actually motivated by the proffered reasons. *Id.* (citing *Bd. of Tr. of Keene State College v. Sweeney*, 439 U.S. 24, 25 (1978)). It is sufficient if the evidence raises a genuine issue of fact as to whether the defendant discriminated against the plaintiff. *Texas Dep't. of Cmty. Affairs*, 450 U.S. at 254.

To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. *Id*. at 255. The explanation provided must be legally sufficient to justify a judgment for the defendant. *Id*. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity. *Id*. Placing this burden of production on the defendant thus serves simultaneously to meet plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. *Id*. at 255-56. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions. *Id*. at 256.

Here, Plaintiff satisfies the first three prongs of the prima facie case: (1) he is over

40 years old; (2) he was qualified for his position; and (3) he was subject to an adverse job action. Defendant only disputes the fourth prong of the *prima facie* case, to wit: (4) whether he was replaced by a younger person or treated differently than a similarly-situated younger employee. *McDonnell Douglas*, 411 U.S. at 802.

### a. Whether Plaintiff was replaced by a significantly younger employee

A person is "replaced" when another employee is hired or reassigned to perform the plaintiff's duties. *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990).

Initially, after Plaintiff's termination, the performance of his former duties was split between his supervisor Bill Fleming and Category Specialist Cloyde Paddock (who is one year younger than Plaintiff).[3] (Doc. 31 at 45-47). Defendant later hired two employees, Darlene Miller (who was 51 years old when she was hired), and Lauren Jungkunz (who was 22 years old when she was hired), each of whom assumed the procurement responsibilities for some of Plaintiff's former product lines. (*Id.*) Plaintiff alleges that because Ms. Miller was hired after another employee, Ms. Rosser, was terminated, Ms. Miller must have replaced Ms. Rosser, and Ms. Jungkunz must have replaced Plaintiff. (Doc. 39 at 11). However, this is contrary to the record evidence that

---

[3] Plaintiff claims that it is irrelevant that his duties were assumed briefly by his supervisor until Ms. Jungkunz could assume those duties because Plaintiff is not required to show that he was immediately replaced by an employee from outside the protected class. *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 233 (6th Cir.), *cert. denied*, 464 U.S. 1001 (1983).

Ms. Miller and Ms. Jungkunz both assumed some of both Plaintiff's and Ms. Rosser's former duties. (Doc. 31 at 45-46).

Plaintiff cites to the deposition testimony of co-worker Gary Krebs for the proposition that Ms. Jungkunz was hired to replace him. (Doc. 39 at 11). But Plaintiff fails to point out that Mr. Krebs testified that it was only an "assumption" on his part and that he "[doesn't] know for a fact" that Ms. Jungkunz replaced Plaintiff. (Doc. 29 at 56). Moreover, Mr. Krebs also testified, consistent with the testimony of Bill Fleming, that, after Plaintiff's termination, there was a restructuring of the department, and Plaintiff's lines of products were redistributed to multiple employees. (*Id*. at 57-58). Because neither Mr. Paddock nor Ms. Miller is significantly younger than Plaintiff, there can be no inference of age discrimination with respect to Plaintiff's termination and the re-assignment of his duties. *Corrigan v. U.S. Steel Corp*., 478 F.3d 718, 727 (6th Cir. 2007) ("Significantly younger has been interpreted to mean someone 8 years younger or more."). Additionally, the fact that some of Plaintiff's job duties were assigned to Ms. Jungkunz does not give rise to an inference of age discrimination. *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997) ("The fact that younger employees assumed some of [plaintiff's] duties is insufficient by itself . . . to establish a prima facie case of age discrimination.").

Accordingly, because there is no evidence that Plaintiff was replaced by a significantly younger employee, there is no *prima facie* inference of age discrimination.

*See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311-12 (1997) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'").

### b. Whether Plaintiff can establish that similarly situated significantly younger employees were treated better than he was

Next, Plaintiff claims that similarly situated, significantly younger employees were treated more favorably than he was. Although a plaintiff is *not* required to show that he and a comparator had identical performance histories, he is required to show similarity in all *relevant* respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998). Thus, this Court must make an independent determination of the relevancy of a particular aspect of Plaintiff's employment status and that of the non-protected employee. *Id*.

The Sixth Circuit recently clarified the proper framing of the similarly situated analysis, reversing a district court's grant of summary judgment to an employer in *Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 412 (2008). The district court in *Martin* made impermissible findings of fact to distinguish a comparator from the plaintiff and framed the similarly situated standard too narrowly by necessitating an exact correlation "not required by the law of this circuit." *Id.* Instead, the *Martin* Court

stressed the need for similarity in all the *relevant* aspects and emphasized that the "*prima facie* showing is not intended to be onerous. *Id.*

Plaintiff points to three alleged comparators, Holly Kuhn, Sarah Jolley Humphries, and Tim McCormick, as the basis for the allegation that he was treated differently than "multiple significantly younger employees." (Doc. 39 at 12). This allegation is contrary to the record with respect to all three alleged comparators.

Holly Kuhn was not similarly situated to Plaintiff for several reasons. First, she had been employed as a Procurement Specialist for less than six months at the time of Plaintiff's termination. (Doc. 31 at 37; Doc. 24 at 67). Therefore, she could not have had the same record that led to Plaintiff's PIP and ultimate termination. Further, Ms. Kuhn purchased equipment and supplies, a category that Plaintiff never purchased and that he acknowledges is more complicated than the others, requires different skills and knowledge, and has different performance measurements than any other category. (Doc. 24 at 34, 36-38, 44-45, 68). Also, unlike Plaintiff, Ms. Kuhn had "absolutely" demonstrated an ability to do better than "competent" in certain areas. (Doc. 31 at 48). Within a year of taking over the equipment and supplies category, she turned around the days of inventory for that category, lowering it by almost ten days. (*Id*. at 49). As Mr. Fleming testified, "it takes a year to get comfortable in the position, and Ms. Kuhn absolutely demonstrated her potential in her first year." (*Id*. at 48).

Plaintiff's assertion that Ms. Kuhn "was performing at a lower level than [he]

during calendar year 2008" is unsupported by the record. (Doc. 39 at 7-8). Plaintiff cites to Mr. Fleming's deposition, but Mr. Fleming suggested that Plaintiff's performance in 2008 was "incompetent for somebody that had been there with the experience." (Doc. 31 at 51). Mr. Fleming also explained that Ms. Kuhn, who had come in and turned around her product category in days of inventory, may have needed improvement, but that was to be expected because she had been there for only six or nine months. (*Id*. at 49, 51).

Plaintiff's citation to Mr. Nicholas and Mr. Moyer's depositions for the assertion that "[m]anagement witnesses could offer no explanation" for the different treatment[4] of Plaintiff and Ms. Kuhn is likewise flawed. (Doc. 39 at 8). Contrary to Plaintiff's assertion, Mr. Nicholas explained that Plaintiff's termination "was based on his individual criteria and his performance relative to those criteria." (Doc. 27 at 101). Ms. Kuhn had "different goals to hit and had substantially less tenure and experience than Paul Millner did." (*Id.*) Further, Mr. Moyer was not Plaintiff's supervisor and had no involvement in the evaluation, progressive discipline, or termination of Plaintiff, so he had no basis to know why Plaintiff was terminated. (Doc. 26 at 19-21). There is no evidence that Ms. Kuhn was subject to the same standards or engaged in the same poor performance as Plaintiff. Therefore, Ms. Kuhn is not similarly situated to Plaintiff.

Plaintiff also claims that Ms. Humphries is a similarly situated comparator. (Doc.

---

[4] The different treatment referred to by Plaintiff is the fact that Plaintiff was terminated after several years of poor performance and failure to improve under a PIP, and Ms. Kuhn was not terminated within her first nine months of employment.

39 at 8, n.1). Plaintiff asserts, without any evidentiary support, that "Humphries' performance was no better than Millner's." (*Id*. at 8). This is contrary to Plaintiff's own deposition testimony where he admitted that Ms. Humphries is not similarly situated to him because she "was doing a real good job":

> Q. Who else?
> A. The only others are Gary, and that's a different thing altogether. And because it's a different category with produce, the only other one is Sarah Humphreys, Sarah Jolley, who was doing a real good job.
> Q. The question was what other employees do you feel were similarly situated but received more favorable treatment than you?
> A. Yes, I understand that question.
> Q. And you've listed these four people, right: Betty Rosser, Holly Kuhn, Steve Rogers and Sarah Jolley?
> A. Not Sarah Jolley, no.
> Q. So you don't think she received more favorable treatment?
> A. Correct.
> Q. Because she was doing a real good job?
> A. Yes.

(Doc. 24 at 124-125). Therefore, the fact that Defendant continued to employ Ms. Humphries, who was doing a "real good job," cannot create an inference of age discrimination.

Finally, Plaintiff names Tim McCormick as the third allegedly similarly situated comparator. (Doc. 39 at 8). Plaintiff claims that the record evidence suggests that Mr. McCormick has never received an evaluation higher than a "needs improvement," yet he remains employed. (Doc. 26 at 35-36). It is undisputed that Mr. McCormick is a

Category Manager (also called Category Specialist), not a Procurement Specialist. (Doc. 24 at 58-59; Doc. 26 at 35; Doc. 30, Ex. 5). As a Category Manager, Mr. McCormick reported to Mr. Moyer, not Mr. Fleming (Plaintiff's supervisor). (*Id.* at 58). Additionally, the Category Manager duties were almost entirely distinct from the Procurement Specialist duties. The main responsibility of Category Managers is to interact with vendors, brokers, and customers, rather than procure product. (Doc. 24 at 58; Doc. 25 at 9-10). Plaintiff's assertion that "Sysco used the same tools to evaluate Category Specialists and Procurement Specialists" is unsupported by any record evidence.[5] Therefore, there is no basis to compare Mr. McCormick's performance as a Category Specialist in 2008 and 2009 with Plaintiff's performance as a Procurement Specialist from 2006 to 2008.

Moreover, there is no evidence that the decision makers in this case, Mr. Nicholas and Mr. Brough, had any involvement in or knowledge of Mr. McCormick's October 2008 or February 2009 performance evaluations. Mr. Nicholas left the Company in October 2008 and testified that he was unaware that Mr. McCormick ever received an evaluation indicating that his performance needed improvement. (Doc. 27 at 28-29, 34, 100). Mr. Brough left the Company in February 2009 and testified that, during his employment, he did not know about any Merchandising Department employees' performance unless a manager brought a performance issue to his attention. (Doc. 28 at

---

[5] Plaintiff cites to the deposition of Cloyde Paddock at Exhibit 5 to support this assertion. However, Exhibit 5 was not filed with the deposition.

27, 37). Because there is no evidence that Mr. McCormick dealt with the same supervisor, was subject to the same standards, or engaged in the same conduct as Plaintiff, he cannot be deemed similarly situated, and his continued employment cannot create an inference of age discrimination.

Finally, Plaintiff's assertion that the fourth prong of the *prima facie* case is satisfied because "Sysco Management admitted that all of the Procurement Specialists had struggled in recent years due to economic conditions" is not supported by the evidence. (Doc. 39 at 12). First, as stated above, to establish a *prima facie* case using a similarly situated analysis, it is the Plaintiff's burden to identify specific employees who were treated more favorably. A blanket statement that "all of the Procurement Specialists had struggled in recent years," does not satisfy this legal standard. Additionally, there is no evidence that other Procurement Specialists performed as poorly as Plaintiff in the three objective criteria in as many different months as Plaintiff did over the 2006-2008 period. Plaintiff's citation to Mr. Moyer and Mr. Paddock's depositions does not support any comparison between Plaintiff and other Procurement Specialists. Mr. Moyer, who was Mr. Paddock's supervisor but not Plaintiff's supervisor, testified that he did not know the specifics of Plaintiff's performance. (Doc. 26 at 47). And Mr. Paddock's general impression that all Procurement Specialists needed improvement was based only on Mr. Moyer's allegedly telling him that his (Paddock's) evaluation of "needs improvement" was "based on the Company's performance overall of being inferior." (Doc. 30 at 22). There is no evidence that Mr. Paddock or Mr. Moyer had any specific knowledge of the performance of any Procurement Specialists.

Because there is no evidence that any significantly younger, similarly situated employees were treated differently than Plaintiff, there is no *prima facie* case of age discrimination, and the age discrimination claims should be dismissed as a matter of law.[6]

### B. Wrongful Discharge in Violation of Public Policy

Ohio recognizes the tort of wrongful discharge in violation of public policy as an exception to the employment-at-will doctrine. *Greeley v. Miami Valley Maint. Contrs., Inc.*, 49 Ohio St.3d 228 (1990). The tort requires four elements: (1) that there exists a clear public policy that was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element); (2) that the dismissing of employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) that the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element). *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70 (1995) (citing H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U. Cin. L. Rev. 397, 398-99).

Plaintiff cannot establish the third or fourth elements of his public policy/ retaliation claim: (3) that his dismissal was motivated by his consultation with an

---

[6] Plaintiff understood the need to achieve his PIP goals, and he failed to do so. (Doc. 24 at 88-89, 94-96, 109-112, 210-214, 225-230, 240-241, 255-256). *See Baker v. Medtronic, Inc.*, No. 1:07-cv-286, 2009 U.S. Dist. LEXIS 27068, at *23-27 (S.D. Ohio Apr. 2, 2009) (granting summary judgment where, as in the instant case, the plaintiff admitted to poor performance that led to placement on a PRP and for failure to achieve his PIP goals) (Spiegel, J.).

attorney, and (4) that Sysco lacked a legitimate business justification for discharging him. *Bickley v. FMC Techs., Inc.*, 282 F. Supp. 2d 631, 642 (N.D. Ohio 2003). Plaintiff bases his public policy/retaliation claim entirely on the fact that Plaintiff told Rex Brough, two days before his termination (on June 2, 2008), that he had consulted with counsel about the proposed separation agreement. (Doc. 39 at 19).

Plaintiff provides no evidence that his consultation with an attorney motivated his discharge. Instead, Plaintiff argues that the proximity in time to his termination provides a "compelling" reason for a jury to find a causal connection. (*Id.*) But this argument is belied by Plaintiff's own deposition testimony. Plaintiff admitted that he understood as of April 24, 2008, that if his performance did not improve in 30 days, he was going to be terminated. (Doc. 24 at 81, 108-109). At that time, Plaintiff expected to be terminated by the end of May 2008. (*Id.* at 111).

After further communication with Mr. Brough in May 2008, Plaintiff understood that if he did not sign a separation agreement relating to extending his employment through the end of June 2008, he would be terminated by June 4, 2008. (*Id.* at 112). Plaintiff does not dispute that the Company advised him to consult with an attorney about the separation agreement.[7] Further, Plaintiff does not dispute that he did not sign the separation agreement. Therefore, by his own admission, he expected to be terminated on

---

[7] Q. What did Mr. Brough say to you when he gave the [seperation agreement] to you?
   A. He handed this to me, indicated that I should read it closely – and we may have even read it together – indicated to me that I should pay attention to the last page for sure. I should contact an attorney prior to signing this, which I did."
   (Doc. 24 at 103, Ex. I; Doc. 28 at 27).

June 4, 2008.

Moreover, the record is replete with evidence that Sysco had a legitimate business justification for discharging him. Because Plaintiff has no evidence to prove that the articulated reason for his June 4, 2008 discharge was a pretext for unlawful retaliation, his public policy claim should be dismissed as a matter of law.

## V.  CONCLUSION

Based on the evidence of record, the undersigned finds that Defendant's motion for summary judgment is well taken as there are no genuine issues of material fact in dispute, abd Defendant is entitled to entry of judgment. It is therefore **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 38) be **GRANTED** and the case be **CLOSED.**


Date: <u>February 1, 2010</u>     s/ Timothy S. Black
                                   Timothy S. Black
                                   United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PAUL MILLNER, | : | Case No. 1:08-cv-841 |
| Plaintiff, | : | Judge Herman J. Weber |
| vs. | : | Magistrate Judge Timothy S. Black |
| SYSCO FOOD SERVICES OF CINCINNATI, LLC | : | |
| Defendant. | : | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **14 DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **14 DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).